**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**DENNIS FLOYD,**

**Plaintiff,**

**- against -**

**WARDEN BAILEY, C.O. CALDWELL, C.O. REES, CAPT. SINGLETARY,**

**Defendants.**

**10 Civ. 7794 (JGK)**

**MEMORANDUM OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

The plaintiff, Dennis Floyd, brings this action against Warden Bailey, Correction Officer Caldwell, Correction Officer Rees, and Captain Singletary, alleging that they violated his rights under the United States Constitution during and after a strip search. In this action pursuant to 42 U.S.C. § 1983, the plaintiff, a pro se inmate, alleges that the defendants' conduct constituted: (1) an unlawful search in violation of the Fourth Amendment, and (2) use of excessive force in violation of the Eighth Amendment.[1] The defendants now move for summary judgment

[1] In his Amended Complaint, the plaintiff also alleged that the defendants' conduct constituted deliberate indifference to serious medical needs in violation of the Eighth Amendment. At Oral Argument, however, the plaintiff withdrew that claim and chose to proceed solely on the remaining two claims.

on these claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2]

**I.**

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S.

[2] The defendants also moved for summary judgment dismissing the plaintiff's state law claims because the plaintiff failed to file a notice of claim under N.Y. Gen. Mun. Law § 50-e. However, the Amended Complaint does not allege any state law claims, and thus the defendants' arguments are moot.

at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases).

Where, as here, a pro se litigant is involved, although the same standards for dismissal apply, a court should give the pro se litigant special latitude in responding to a summary judgment

motion. See McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest'" (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994))). In particular, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. Local Civ. R. 56.2; see also McPherson, 174 F.3d at 281; Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir. 1999). Nevertheless, ". . . the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citing Giannullo v. City of New York, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (stating that not verifying in the record the assertions in the Rule 56.1 statement "would derogate the truth-finding functions of the judicial process by substituting convenience for facts")).

In this case, the defendants urge the Court to take the facts in their statement pursuant to Local Civil Rule 56.1 as true because the plaintiff failed to respond to their Rule 56.1 statement. However, because the Court is not satisfied that each of the defendants' Rule 56.1 assertions is supported by the

evidence in the record, it declines to rely solely on the defendants' Rule 56.1 statement. See id. Moreover, there is no indication that the defendants complied with Local Civil Rule 56.2 and explained to the plaintiff the consequences of failing to respond to a motion for summary judgment and the need to file responsive evidentiary materials. However, the Court held Oral Argument on the motion and permitted the plaintiff to file any further materials. In view of the Court's disposition, the defendants' failure to comply with Local Civil Rule 56.2 was wrong, but harmless, because the Court has carefully scrutinized the evidence and the arguments, and the plaintiff has not suggested there is anything further to produce. See, e.g., M.B. v. Reish, 119 F.3d 230, 232 (2d Cir. 1997) (per curiam) (holding that affirmative notice was not required where the pro se litigant "understood the need to set forth all available evidence demonstrating a genuine dispute over material facts").

## II.

The following facts are undisputed for the purposes of this motion, unless otherwise indicated.

As of April 20, 2010, the plaintiff was incarcerated at the Robert N. Davoren Center ("RNDC") on Riker's Island. (Complete Deposition of Dennis Floyd ("Floyd Dep.") at 21.) At or about 9:00 A.M. on April 20, 2010, there was a physical altercation

between two inmates, Joshua S. and Zelton C., in the dayroom of the 2 Upper North housing area. (Lulich Decl., Ex. D ("Unusual Incident Report") at NYC 157, 165, 171, 173, 201.) Correction Officer Caldwell witnessed the fight and gave verbal orders for the inmates to cease fighting. (Unusual Incident Report at NYC 157, 165, 171, 173, 201.) When they refused to comply, Officer Caldwell activated his personal body alarm. (Unusual Incident Report at NYC 157, 165, 171, 173, 201.) At some point, another inmate in the dayroom, David P., was cut on the right side of his face. (Floyd Dep. at 31-32; Unusual Incident Report at NYC 159, 160, 167, 171-74, 195, 203; Lulich Decl., Ex. E ("Incident Information Report") at NYC 320-24, 326.)

The plaintiff alleges that he was at the phones near the dayroom when he saw the two fighting inmates burst through the doors out of the dayroom. (Floyd Dep. at 24-30, 69-72.) According to the plaintiff, Officer Caldwell was yelling at them to stop and told some inmates, including the plaintiff, to go inside the dayroom. (Floyd Dep. at 30.) The plaintiff alleges that upon entering the dayroom he saw several inmates and saw that someone had a cut across his face, but denies cutting the person or seeing him get cut. (Floyd Dep. at 30-33.) By contrast, Officer Caldwell reported observing the plaintiff approach David P. in the dayroom and then punch and slash the

right side of David P.'s face, which began bleeding. (Unusual Incident Report at NYC 203-04.)

A team of prison staff came to the dayroom in response to Officer Caldwell's call for assistance, including Correction Officer Rees and Captain Singletary. (Unusual Incident Report at NYC 157, 165, 167, 171, 189-90, 195-96, 199-200, 201-04; Incident Information Report at NYC 320-24.) The plaintiff alleges that Warden Bailey was also among the correction officers who arrived. (Am. Compl. at III.C; Floyd Dep. at 22, 41.)

2 Upper North was placed in lockdown status while the plaintiff and other inmates were present in the dayroom. (Floyd Dep. at 22, 37-38; Unusual Incident Report at NYC 172, 174; Incident Information Report at NYC 320-24.) The plaintiff alleges that Officer Caldwell picked out the inmates "who he felt [were] the bad guys of the house," including the plaintiff and three other inmates, to remain in the dayroom. (Floyd Dep. at 32-39.)

Correction officers, including Officer Rees, conducted a strip search of the inmates in the dayroom. (Am. Compl. at III.C; Floyd Dep. at 22, 40-41; Unusual Incident Report at NYC 157, 159, 167,171-74, 189, 195, 199; Lulich Decl., Ex. F ("Notice of Infraction").) Captain Singletary ordered Officer Rees to strip search all the inmates in the dayroom, and Officer

Rees complied and ordered the plaintiff to strip in front of the others. (Am. Compl. at III.C; Floyd Dep. at 22, 57; Unusual Incident Report at NYC 199-200.) Correction officers asked the plaintiff multiple times whether he had a weapon on his person, but the plaintiff just laughed. (Floyd Dep. at 76-77.)

The plaintiff alleges that once he was naked, he started laughing and told Warden Bailey "he's funny," and then Warden Bailey told Officer Rees to "teach [the plaintiff] a lesson." (Am. Compl. at III.C; Floyd Dep. at 22, 45, 56.) The plaintiff alleges that Officer Rees then punched the plaintiff on the right side of his face, knocking the plaintiff to the ground. (Am. Compl. at III.C; Floyd Dep. at 22, 46-47.) The plaintiff alleges that Officer Caldwell, Officer Rees, and another correction officer proceeded to kick him several times in the ribs and lower back while he was curled up naked on the ground. (Am. Compl. at III.C; Floyd Dep. at 47-50.)

At the time, the plaintiff was hiding a razor under his foot. (Floyd Dep. at 51-52, 58.) Officer Rees noticed that the plaintiff was limping, instructed him to lift up his foot, and discovered the razor. (Floyd Dep. at 52-58; Unusual Incident Report at NYC 159, 163, 164, 167, 172, 173, 189-90, 193-96, 199-200; Incident Information Report at NYC 320-24; Notice of Infraction.) The plaintiff alleges that after Officer Rees found the razor, Officer Rees again punched the plaintiff on the

right side of his face, and the plaintiff fell to the floor and curled up. (Floyd Dep. at 47, 58-59.) The plaintiff alleges that he sustained injuries from the correction officers' punches and kicks, including a black eye and sore ribs, which lasted for about a week and a half. (Floyd Dep. at 64, 80-85.)

The plaintiff then got dressed in a jumpsuit, was handcuffed, and was taken to the intake area. (Floyd Dep. at 60.) The plaintiff was charged with possession of a razor and cutting David P.'s face. (Floyd Dep. at 65, 88; Notice of Infraction.) Later that night, the plaintiff was transferred to pre-hearing detention. (Floyd Dep. at 65.)

The plaintiff alleges that he "was refused medical attention for 6 days" (Am. Compl. at III.C) by being held in pre-hearing detention for about a week before seeing a doctor on the day of his hearing (Floyd Dep. at 66, 96-99). In pre-hearing detention, medical staff members conducted "sick call," during which they walked by the cells every morning. (Floyd Dep. at 66-67.) The plaintiff alleges that he "eventually" caught a nurse and asked to see a doctor, but he never saw a doctor until after his disciplinary hearing. (Floyd Dep. at 65-67.)

The plaintiff alleges that he did not see nor speak to any medical staff member on April 20, 2010. (Floyd Dep. at 64, 77-78.) The plaintiff signed an Injury to Inmate Report dated

April 20, 2010, which indicated that he refused a medical evaluation and that he had no visible injuries. (Lulich Decl., Ex. G ("Injury to Inmate Report dated April 20, 2010").) Although the plaintiff admits that his signature appears on the April 20th Report, he claims that he never went to the doctor on April 20th to sign the Report and never refused a medical evaluation, but instead signed the Report without reading it at a different time. (Floyd Dep. at 78-80.) The plaintiff alleges that he did have visible injuries on April 20th, specifically his black eye. (Floyd Dep. at 80.) On April 25, 2010, the medical staff prescribed Sudafed for the plaintiff, and the accompanying medical record indicates that the Sudafed was for nasal congestion. (Floyd Dep. at 99-101; Lulich Decl., Ex. H ("Correctional Health Services Progress Note").)

On April 26, 2010, the plaintiff appeared at an inmate disciplinary hearing on the charges against him for possession of a razor and for cutting David P.'s face. (Floyd Dep. at 88-89; Lulich Decl., Ex. I ("Investigating Supervisor's Report") at NYC 262-63.) The plaintiff was found guilty on both charges but the charges were later dismissed on appeal. (Floyd Dep. at 90.) Before the hearing, the plaintiff had filed a written grievance about the alleged use of force against him on April 20, 2010. (Floyd Dep. at 91-92; Incident Information Report at NYC 327-30.) At the hearing, the plaintiff told the hearing officer

that correction officers had assaulted him on April 20th, and the hearing officer responded that the matter would be investigated. (Floyd Dep. at 88-95; Investigating Supervisor's Report at NYC 262-63.) Correction staff then began conducting a Use of Force Investigation. (Investigating Supervisor's Report at NYC 262-65.)

On April 26, 2010, after the hearing, a physician's assistant examined the plaintiff as part of the Use of Force Investigation. (Floyd Dep. at 96:22-99:7; Lulich Decl., Ex. C ("Injury to Inmate Report dated April 26, 2010").) The plaintiff alleges that he showed the physician's assistant his black eye and his ribs, and the April 26th Report indicates that the plaintiff had visible injuries, specifically a slight discoloration under his right eye. (Floyd Dep. at 98-102; Injury to Inmate Report dated April 26, 2010.) However, the physician's assistant did not give or prescribe any treatment for the plaintiff. (Floyd Dep. at 98-102; Injury to Inmate Report dated April 26, 2010.)

Like four other correction officers who are not named in this action, Officer Caldwell reported that he did not witness any force used on the plaintiff on April 20, 2010. (Investigating Supervisor's Report at NYC 263.) The Use of Force Investigator stated that he could not ascertain whether or not the plaintiff sustained injuries on April 20th, but that

correction officers had reported that they did not use or witness any force. (Investigating Supervisor's Report at NYC 265.) Accordingly, the Use of Force Investigator concluded that the plaintiff's allegation of a use of force was unsubstantiated. (Investigating Supervisor's Report at NYC 265.)

**III.**

The plaintiff now alleges that the defendants' conduct constituted: (1) an unlawful search in violation of the Fourth Amendment, and (2) use of excessive force in violation of the Eighth Amendment.[3]

**A.**

**1.**

First, the plaintiff alleges that the strip search was an unlawful search in violation of the Fourth Amendment. While it is true that the constitutional rights of prison inmates are

---

[3] The defendants assert that because the plaintiff did not respond to their arguments regarding his excessive force claim in his opposition brief, that claim should be deemed abandoned. However, the plaintiff made clear at Oral Argument that he was not abandoning his excessive force claim. Moreover, the defendants failed to provide the plaintiff with the notice required under Local Civil Rule 56.2. In any event, the plaintiff has not withdrawn his excessive force claim, and the Court has reviewed the plaintiff's deposition to determine if there are issues of fact that preclude summary judgment.

restricted because of the institutional needs of imprisonment, see Price v. Johnston, 334 U.S. 266, 285 (1948), the Fourth Amendment still requires that strip searches of inmates be reasonable.  See Hodges v. Stanley, 712 F.2d 34, 35 (2d Cir. 1983) (per curiam) (citing Bell v. Wolfish, 441 U.S. 520, 559 (1979)).  The need for a particular search must be balanced against the resulting invasion of personal rights.  Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 132 S. Ct. 1510, 1516 (2012) (citing Bell, 441 U.S. at 559).  In determining whether a particular strip search is reasonable, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  Bell, 441 U.S. at 559 (collecting cases).

    Generally, strip searches have been upheld as reasonable so long as they are reasonably related to legitimate penological interests.  See, e.g., Florence, 132 S. Ct. at 1515-17; Covino v. Patrissi, 967 F.2d 73, 78-79 (2d Cir. 1992); Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 218, 323 (S.D.N.Y. 2006).  Given the legitimate penological interest in the safety of inmates, "prison officials have an obligation to take reasonable measures to protect the safety of the prison's inmates." Arnold v. Westchester Cnty., No. 09 Civ. 3727, 2012 WL 336129, at *11 (S.D.N.Y. Feb. 3, 2012) (citation omitted).  The Supreme Court

recently noted that correctional officials must be permitted to detect and deter the possession of contraband in their facilities, see Florence, 132 S. Ct. at 1517, and that policies designed to keep contraband out of prisons--including strip searches--have been upheld in cases decided since Bell, id. at 1516. "After a fight between two inmates in which one inmate suffers injuries that were likely caused by a weapon, it is plainly proper for prison officials to search both inmates for such weapons or other contraband." Arnold, 2012 WL 336129, at *11 (citing Jean-Laurent, 438 F. Supp. 2d at 323.)

In this case, the correction officers' search of the plaintiff was reasonable. On April 20, 2010, an inmate in the dayroom was cut on his face, and the weapon used in the slashing was not immediately found. (Floyd Dep. at 77.) The correction officers strip searched the inmates in the dayroom in an attempt to find the weapon. (Floyd Dep. at 77.) They asked the plaintiff multiple times whether he had a weapon on his person, but the plaintiff just laughed and did not admit or deny that he had a razor. (Floyd Dep. at 76-77.) Strip searching the plaintiff, who was in the vicinity where another inmate had been injured by a weapon, was plainly proper to ensure the safety of the inmates in the facility. Because the correction officers' search of the plaintiff was reasonable, the defendants' motion

for summary judgment with respect to the plaintiff's unlawful search claim is granted.

**2.**

Second, the plaintiff alleges that the defendants used excessive force against him in violation of the Eighth Amendment. A claim of excessive force requires a plaintiff to satisfy both an objective and a subjective prong. See, e.g., Hudson v. McMillian, 503 U.S. 1, 8 (1992). "[C]ourts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

The objective prong "focuses on the harm done, in light of contemporary standards of decency." Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009) (citation and internal quotation marks omitted). "[W]hen prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated . . . whether or not significant injury is evident.'" Id. at 268-69 (quoting Hudson, 503 U.S. at 9). The subjective prong "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances

surrounding the challenged conduct." Id. at 268 (citation and internal quotation marks omitted). "The core judicial inquiry . . . [is] not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) (per curiam) (citation and internal quotation marks omitted).

In his deposition testimony, the plaintiff describes in sufficient detail how the defendants allegedly assaulted him on April 20, 2010. (Floyd Dep. at 45-50.) Those sworn allegations are sufficient to allege facts supporting a wanton infliction of harm. While Officer Caldwell and other correction officers deny using any force against the plaintiff, there are plainly genuine issues of material fact as to whether the defendants assaulted the plaintiff as the plaintiff described--specifically, whether Warden Bailey ordered Officer Rees to "teach [the plaintiff] a lesson," whether Officer Rees "immediately and without provocation" punched the plaintiff in the face, and whether Officers Rees and Caldwell kicked the plaintiff while he was on the ground. (Am. Compl. at III.C.)

The defendants argue that the plaintiff's version of the April 20th events is "internally implausible" and "not credible" because, as they claim, the plaintiff would not have been able

to keep a razor hidden under his foot while being assaulted. (Defs.' Mem. Supp. Mot. Summ. J. at 13-14.) However, the plaintiff explained at Oral Argument that the razor was secured to the bottom of his foot, and at the disciplinary hearing he was in fact found to have possessed the razor. The plaintiff's allegations, if credited, could reasonably allow a rational jury to find that the defendants used force maliciously and sadistically to cause harm. Therefore, the defendants' motion for summary judgment with respect to the plaintiff's excessive force claim is denied.

**B.**

A plaintiff must plead the personal involvement of each defendant in a violation of § 1983. "There is no respondeat superior liability in § 1983 cases." Green v. Bauvi, 46 F.3d 189, 194 (2d Cir. 1995) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. Here, Captain Singletary is only alleged to have ordered the strip search of the inmates in the dayroom, which, as explained above, was not a constitutional violation. There are no allegations that Captain Singletary was involved in the use of force against the plaintiff. Because the plaintiff's

excessive force claim is the only claim that survives the defendants' motion for summary judgment, and because Captain Singletary lacked personal involvement in that claim, all claims against Captain Singletary are dismissed.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment is **granted** with respect to the plaintiff's unlawful search claim but **denied** with respect to the plaintiff's excessive force claim, except all claims against Captain Singletary are dismissed. The Clerk is directed to close Docket No. 56.

**SO ORDERED.**

**Dated: New York, New York**
**March 12, 2013**

/s/

**John G. Koeltl**
**United States District Judge**